STANLEY J. FIORITO AND ANOTHER v.
CALIFORNIA INSURANCE COMPANY.

114 N. W. (2d) 661.

April 13, 1962—No. 38,394.

*F. L. Palarine,* for appellants.
*Thomas, King, Daubney, Swenson & Collatz,* for respondent.

ROGOSHESKE, JUSTICE.

This is an action to recover for damages to a gas-fired furnace under a fire insurance policy issued by the defendant to plaintiffs.

At the close of plaintiffs' testimony the municipal court of St. Paul directed a verdict for defendant. Plaintiffs' motion for a new trial was denied, and they appeal.

The single issue presented is whether the evidence, viewed most favorably to plaintiffs, required the trial court to hold that the fire involved was "friendly" as a matter of law or whether it might have been found by the jury to be "hostile."

The testimony, so viewed, could establish the following facts: Plaintiffs are the owners of a building in which they operate the Venice Cafe and rent two upstairs apartments. These premises were insured by defendant against "any and all loss or damage by fire originating from any cause." In 1957 or 1958, at a cost of $1,040, they installed, in the basement of the building, a gas-burning furnace which provided steam or hot-water heat for the premises. On April 24, 1959, their employee, Kenneth Hosli, upon reporting for work at 6 a. m., checked the thermostat located upstairs. It was set at 70 degrees as was customary. There had never been any malfunctioning of the thermostat since the furnace was installed. He thereupon commenced his work of cleaning up, carrying up beer from the basement, as well as filling the cooler and sorting empty bottles which had been sent down "beer chutes," two 6- or 8-inch metal tubes running from the bar to the basement. This occupied him until about 6:30 a. m. From that time on he worked behind the bar. About 9 a. m. he smelled and noticed smoke and heat "pouring up out of the chutes." He and another immediately went down into the basement and observed "flames about a foot high or so roaring up" and coming out of the front door of the furnace, the paint and enamel burning on the outer jacket of the furnace, and a cardboard beer case burning on the top of the furnace. He immediately turned off the furnace and knocked the cardboard carton to the floor and "threw water on it and put it out." He further described that the enamel on the outside was burning and the "flames were just roaring inside." His further testimony would support a finding that the front of the furnace as well as other parts thereof were "white hot" and that when the furnace cooled the entire exterior became "grayish" in color. When he examined and looked inside the furnace the next morning the grate appeared melted and "was all run together" and the "jacket and the boiler was all cracked up." The plaintiff Stanley J. Fiorito, who was called and arrived about 10 a. m., observed the furnace all "burned" and "scorched" and the outside to be "grayish-white" in color, and 2 or 3 days later the "grates" were "bent so they couldn't stay together," and "everything was deteriorated in there, that was nothing you could save." He was required to replace the furnace at a cost of $1,450. Richard Berry, an adjuster

for defendant who saw the furnace in September, did not observe any "scorching or charring" on the outside of the furnace. He did see "paint blistering on the front and the one side of the furnace" and some "peeling or flaking." He did not look at the top nor did he find it necessary to look inside.

The court directed a verdict for the defendant on the ground that plaintiffs failed to make out a case. The basis was that the evidence established as a matter of law that the fire was "friendly," not "hostile," and, therefore, was not a fire within the contemplation of the language of the policy.

We do not agree. We believe it was a question for the jury.

The doctrine of "friendly" and "hostile" fires has, for many years, been accepted as a judicial addendum to policies of fire insurance. The basic principle is that a "friendly" fire, one which is intentionally kindled for beneficial purposes and which thereafter is confined to the place intended, does not support recovery under insurance against any loss or damage by fire, unless there is some spreading of the flame with injury outside the fire's proper place. This, at least, is the prevailing rule. See, 29A Am. Jur., Insurance, § 1287.

The doctrine had its origin in the early English case of Austin v. Drew, 4 Campb. 360 (1815). In that case plaintiff operated a 7- or 8-story sugar factory. There were pans for boiling sugar and a stove for heating them on the ground floor, with the other floors used for drying the baked sugar. An employee neglected to open the top-floor hot-air register, which was supplied with heat from the flue of the stove, thus causing heat and smoke to be trapped in the building and forced through registers into the sugar-drying rooms. The flames never got beyond the flue but large quantities of sugar were damaged by smoke and heat. In holding the insurance company not liable, Lord Chief Justice Gibbs reasoned that since the heat which produced the damage was from the regular stove used to heat the sugar pans, and since that fire "continued all the time to burn without any excess," and was always confined within its proper limits, it was not a fire within the meaning of the policy. "[N]egligence or misconduct" of the employee, not a fire, was held to be the sole cause of the damage. Id. 4 Campb. 361, 362.

The history and significance of the doctrine and the extent of its applicability in Minnesota is ably chronicled in a recent opinion by Mr. Commissioner Magney, which must control here. L. L. Freeberg Pie Co. v. St. Paul Mutual Ins. Co. 257 Minn. 244, 100 N. W. (2d) 753 (1960). There, a thermostatic control on a baking oven failed to regulate the flames which burned in an uncontrolled manner. The temperature, usually 500 degrees in the day and 200 degrees at night, continued to rise, exceeding 650 degrees, the highest mark on the thermostatic control. Although there was no open flame, the floor was charred through in two places, requiring the firemen to chop through those areas and extinguish the smoldering condition. Estimates on repairing the floor were $100 and $800 while the oven itself, severely warped, was damaged to the extent of $2,016. The lower court held the fire "friendly" and that recovery was barred under a fire policy, such as the one here, drafted in accordance with standard statutory provisions.

Commissioner Magney noted the present-day form of the rule of Austin v. Drew, *supra,* where now the determining factor is the escape of the fire from its proper place. He quoted from that opinion as follows (4 Campb. 362):

"* * * Had the fire been brought out of the flue, and any thing had been burnt, the Company would have been liable. But can this be said, where the fire never was at all excessive, and was always confined within its proper limits?"

Then Commissioner Magney stated (257 Minn. 248, 100 N. W. [2d] 755):

"The rule as stated in the texts above cited and in the decided cases ignores entirely these references to the nature of the fire in question, that it continued 'to burn without any excess' and 'never was at all excessive.' The excessiveness of the fire, however great and destructive it might be if confined to the place where it was intended to be, has been considered immaterial in determining whether a fire was 'friendly' or 'hostile.' Although the result we are reaching is contrary to the great majority of decided cases, there is a respectable minority supporting it."

He quoted with favor from a Wisconsin case, O'Connor v. Queen Ins. Co. 140 Wis. 388, 394, 122 N. W. 1038, 1041, 25 L.R.A. (N.S.) 501, 506 (1909), where damage resulted from a fire which never escaped its furnace but which was of such character as to cause smoke, soot, and intense heat to escape through the registers, charring furniture, woodwork, and walls, and cracking the chimney:

"* * * Austin v. Drew, 4 Camp. 360, is not authority against plaintiff here. There the fire was under control, not excessive, and suitable and proper for the purpose intended. It was, in the language of the books, a 'friendly' and not a 'hostile' fire. In the case before us the fire was extraordinary and unusual, unsuitable for the purpose intended, and in a measure uncontrollable, besides being inherently dangerous because of the unsuitable material used. Such a fire was, we think, a 'hostile' fire and within the contemplation of the policy."

In the Freeberg case the court goes on to say that since there was charring outside the oven the fire could be considered "hostile" in law as well as in fact. It might be argued that the facts in the Freeberg case established burning outside the oven. However, it is clear that the excessive nature of the fire is one of the essential elements that can make a confined fire a "hostile" one under our prior decision.

Here, plaintiffs have shown an excessive fire causing extensive damage to the inside of the furnace and resulting in its total loss. While it is true that there was no proof of a faulty thermostat, that fact is not vital to establish the character of the fire. Moreover, there was burning outside the furnace, including the flaming beer carton, even though no damage is claimed for that item. Thus the evidence does establish a prima facie case for plaintiffs.

When the nature of present-day heating devices and equipment is borne in mind, it does not seem warranted to encumber the court-made doctrine originally announced in Austin v. Drew, *supra,* with the requirement that there must be some actual ignition or some burning outside the heating device, even though an excessive fire destroys the device itself. An excessive or uncontrolled fire, sufficient to melt parts of a furnace, surely is included in the intended meaning of the words "loss or damage by fire."

Accordingly, under the doctrine of the Freeberg case and the authorities cited therein, we hold that the evidence before us would sustain a finding that the fire was a "hostile" fire and that the lower court was in error in directing a verdict for defendant.

Reversed and new trial granted.